Judie RICHMAN, Individually and as Personal Representative of the Estate of Kathy Newman, Deceased

v.

CHARTER ARMS CORPORATION.

Civ. A. No. 82–1314.

United States District Court,
E.D. Louisiana,
Section "I".

Aug. 17, 1983.

As Amended Aug. 22 and Oct. 5, 1983.

Windle Turley, Dallas, Tex., for plaintiff.

David R. Frohn, Camp, Carmouche, Barsh, Hunter, Gray & Hoffman, Lake Charles, La., for defendant.

## MEMORANDUM AND ORDER

MENTZ, District Judge.

Early in the afternoon on April 4, 1981, Willie Watson obtained a handgun from an acquaintance. That evening, Watson used the gun, allegedly a "snub nose .38," to kidnap, rob, rape, and then murder Kathy Newman, a third-year medical student at Tulane University. Since committing these crimes, Watson has been tried, convicted and sentenced to death.[1] Watson, however,

---

1. The Louisiana Supreme Court recently af- firmed Watson's conviction but set aside the

is not a defendant in this case. The defendant here is the Charter Arms Corporation. The plaintiff is the victim's mother, Judie Richman. According to Ms. Richman, the defendant is liable to her because it designed, manufactured, and marketed the murder weapon. More specifically, Ms. Richman contends that, because the defendant made the murder weapon available for sale to the general public and because a reasonably foreseeable consequence of doing so was the loss of human life, the company is liable to her for the death of her daughter. The defendant disagrees and has now submitted a motion for summary judgment. The defendant's position is that Louisiana law does not allow courts, under any circumstances, to impose liability on handgun manufacturers for injuries sustained by the victims of illegal handgun violence.

This is a wrongful death case. Jurisdiction is based on diversity of citizenship, and neither party disputes the fact that Louisiana law is controlling. *LeBouef v. Goodyear Tire & Rubber Co.,* 623 F.2d 985 (5th Cir.1980). To prevail on its motion, the defendant must convince the Court that there is no genuine dispute as to any material facts. *AT & T v. Delta Communications Corp.,* 590 F.2d 100 (5th Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). This is a heavy burden, albeit not an insurmountable one, for the court must give to the party opposing the motion the benefit of all reasonable doubts regarding whether a triable issue exists. *Heyward v. Public Housing Administration,* 238 F.2d 689 (5th Cir.1956). In short, at this stage in the litigation, all evidence must be reasonably interpreted in the light most favorable to the plaintiff.[2]

The plaintiff offers three reasons to explain why she is allegedly entitled to the relief requested. No one reason, however, appears to be different in any material way

from any other. The essence of all three is contained in the following statement:

> [The murder weapon] was designed, manufactured, and marketed by Defendant in a defective condition unreasonably dangerous to consumers, bystanders, and the general public, because the risk of [foreseeable] harm associated with marketing the product, as designed, to the general public, greatly outweighs any socially acceptable utility, if any; . . . . Therefore, Charter Arms Corporation is "strictly liable" to Plaintiff.

As the Court interprets this statement, the plaintiff is contending that the defendant is strictly liable to her either on a traditional products liability theory or on a 1 ultrahazardous activity theory. Both the ories have been "developed in part to place liability on the manufacturer [in certain cases] because, by marketing a product, it has assumed a special responsibility to the public and should bear the costs of accidents as a cost of doing business." Note, "Manufacturers' Liability to Victims of Handgun Crime: A Common-Law Approach," 51 Fordham L.Rev. 771, 778 (1983). *See also Kent v. Gulf States Utilities Co.,* 418 So.2d 493, 498 (La.1982); *Philippe v. Browning Arms Co.,* 395 So.2d 310, 318–19 n. 15 (La.1981); *DeBattista v. Argonaut-Southwest Ins. Co.,* 403 So.2d 26, 31 (La.1981); *Langlois v. Allied Chemical Corp.,* 258 La. 1067, 249 So.2d 133, 139 (1971); *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901 (1962) (Traynor, J.); Restatement (Second) of Torts §§ 402A comment c and 519 comment d (1965); Turley, "Manufacturers' and Suppliers' Liability to Handgun Victims," 10 N.Ky.L.Rev. 41, 45 (1981).

This case, however, is quite different from the ordinary strict liability case. In the ordinary case, the reprehensible actions of a person like Willie Watson are not an issue. *See, e.g., Hunt v. City Stores, Inc.,*

---

death sentence and remanded for a new sentence hearing. *State v. Watson,* 423 So.2d 1130 (1982).

**2.** For this reason, but only for the purpose of deciding the present motion, the Court will

assume that the defendant designed, manufactured, and marketed the murder weapon, even though the identity of the responsible person remains in doubt.

387 So.2d 585 (La.1980); *Langlois v. Allied Chemical Corp., supra.* Here they clearly are. Yet, according to the plaintiff, the rationale underlying both theories of recovery is not affected by Willie Watson's conduct. That rationale, she says, provides her with a cause of action regardless of what Willie Watson did. In saying this, the plaintiff is not contending that Willie Watson's conduct should be ignored or that he should be relieved of his responsibility to pay financially for the death of her daughter. What the plaintiff is contending is that, if she chooses to sue for damages, the law does not require her to sue Willie Watson; instead, it allows her to sue and to recover from the defendant and then allows the defendant to try to recover from Willie Watson. The question before the Court, then, is who has the burden of trying to recover from Willie Watson and of bearing the loss in the event that he cannot pay.[3]

The leading decision cited by the plaintiff in support of her products liability theory is *Hunt v. City Stores, Inc., supra.* In that case, the court listed four elements a plaintiff must prove to recover damages in a products liability suit. Those four elements are "[1] that the product was defective, i.e., unreasonably dangerous to normal use; [2] that the product was in normal use at the time the injury occurred; [3] that the product's defect caused his injury; and [4] that the injury might reasonably have been anticipated by the manufacturer." *Id.* at 589,

citing *Weber v. Fidelity & Casualty Insurance Co. of N.Y.,* 259 La. 599, 250 So.2d 754, 755 (1971). *See also DeBattista v. Argonaut-Southwest Ins. Co., supra* at 30. Of these four elements, only the first will be considered here since the plaintiff cannot as a matter of law prove that element.

To establish that a product is "defective" under Louisiana law, a plaintiff "need not prove defective design or manufacture." *Hunt v. City Stores, Inc., supra* at 589.[4] A plaintiff need only prove that the product is "unreasonably dangerous to normal use." *Id.* In this context, "the phrase 'normal use' does not take on its everyday meaning." *Woods v. International Harvester Co., Inc.,* 697 F.2d 635, 637 (5th Cir.1983). The phrase is not limited to "routine or intended use." *LeBouef v. Goodyear Tire & Rubber Co., supra,* at 989. Instead, "it encompasses all *reasonably foreseeable* uses of a product." *Id.* (emphasis in original). By contrast, the phrase "unreasonably dangerous" does have roughly the same meaning in this context as it has in ordinary discourse. The Fifth Circuit recently described this meaning by saying: "A product is ... unreasonably dangerous when a reasonable seller would not sell the product if he knew of the risks involved or if the risks are greater than a reasonable buyer would expect." *Welch v. Outboard Marine Corp.,* 481 F.2d 252, 254 (5th Cir.1973). *See also Bridges v. Chemrex Specialty Coatings,*

**3.** If the defendant is ultimately found liable, it can proceed against Willie Watson under LSA–C.C. arts. 2103 and 2324. *See Dupree v. Pechinay Saint Gobain Co.,* 369 So.2d 1075 (La.App. 1979) *writ denied,* 371 So.2d 1341 (La.1979); *Harvey v. Travelers Insurance Co.,* 163 So.2d 915 (La.App.1964). Whether the defendant could then also proceed against and recover from anyone else, such as the other persons who participated in manufacturing and distributing both the murder weapon and the ammunition, is not an issue now before the Court.

**4.** In *DeBattista,* Justice Dennis wrote that "Louisiana's law in the products liability area has been described by commentators as closely approximating that of common law states following the Restatement (Second) of Torts § 402A." *DeBattista v. Argonaut-Southwest Ins. Co., supra,* at 30 (citations omitted). Justice Dennis then proceeded to apply § 402A to

the facts in the case before the court. *Id.* at 31. In at least one respect, however, not relevant in *DeBattista* but relevant here, § 402A and the law of Louisiana are different. The caveat to § 402A states that "[t]he Institute expresses no opinion as to whether the rules stated in this Section may not apply (1) to harm to persons other than users or consumers." See § 402A Caveat and comments *l* and *o.* The Louisiana Supreme Court, on the other hand, has expressed an opinion on this issue: "A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person...." *Weber v. Fidelity & Casualty Insurance Co. of N.Y., supra,* 250 So.2d at 755. This difference is relevant here because Kathy Newman was a third person, not a user or a consumer, and so fit within the protected class under Louisiana law but not under § 402A.

*Inc.*, 704 F.2d 175, 179 (5th Cir.1983); *De-Battista v. Argonaut-Southwest Ins. Co., supra,* at 30–31 (citing *Welch* and applying Restatement (Second) Torts, § 402A comment i); *Hunt v. City Stores, Inc., supra,* at 589 ("if the likelihood and gravity of harm outweigh the benefits and utility of the manufactured product, the product is unreasonably dangerous"); Wade, "Strict Tort Liability of Manufacturers," 19 Sw.L.J. 5, 15 (1965).

Against the claim that the murder weapon used to kill Kathy Newman was "unreasonably dangerous to normal use," the defendant advances two arguments. The first is that the handgun was not in normal use at the time Ms. Newman was killed because "criminal use is neither normal nor foreseeable use." In support of this argument, the defendant cites two cases involving the illegal use of handguns, *Bennet v. Checker Cab Co., Inc.,* 353 F.Supp. 1206 (E.D.Ky.1973) and *Robinson v. Howard Brothers of Jackson, Inc.,* 372 So.2d 1074 (Miss.1979). The district court in *Bennet* summed up the argument this way:

> Plaintiff alleges that [the defendant in *Bennet*] should have reasonably foreseen and anticipated that the weapon in question would be used in the commission of a crime. The rule concerning foreseeability of a subsequent criminal act is stated in Prosser, Torts, 3d Ed. page 176:
>
> > There is normally much less reason to anticipate acts on the part of others which are malicious and intentionally damaging than those which are merely

negligent; and this is all the more true where, as is usual with the case, such acts are criminal. Under all ordinary and normal circumstances in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law.

*Bennet v. Checker Cab Co., Inc., supra,* at 1210. In both *Bennet* and *Robinson,* the court concluded that criminal use can never be normal use.

This Court disagrees. First of all, Prosser does not say that criminal use is never normal or foreseeable. What he says, in the quoted excerpt, is that criminal use is not normal or foreseeable "in the absence of any reason to expect the contrary." Moreover, in the very same section of the treatise that contains the quoted excerpt, Prosser states that there are "situations in which the defendant will be held liable because his affirmative conduct has greatly increased the risk of harm to the plaintiff through the criminal acts of others." Prosser, *Handbook of the Law of Torts,* 175 (4th ed. 1971). Taken together, these two statements show that it is a mistake to cite Prosser in support of the proposition that criminal use can never amount to normal use.[5]

■ An even more compelling reason for rejecting the defendant's first argument was recently provided by the Fifth Circuit in *LeBouef v. Goodyear Tire & Rubber Co., supra.* In that case, after stating that "normal use" means "reasonably foreseea-

---

5. Other prominent commentators have reached the same conclusion Prosser reached. Professor Bohlen, for example, has written:

> The decided though perhaps not unanimous tendency of modern authority is to make the liability of the original actor depend not upon the negligence or even intentional wrongfulness of the subsequent act of a third party, which is the final decisive cause of the plaintiff's harm, and so upon the legal culpability of such act, but rather upon this,—whether or not, in view of the surrounding circumstances, and the conditions which the defendant's conduct may be expected to create, the third party's subsequent action was normal, and so, expectable.... There is normally no

reason to anticipate wilful wrongdoing of others, but this bears only on the question as to whether the act is expectable or not. In exceptional situations even wilfully wrongful acts of others are normal and expectable. F.H. Bohlen, *Studies in the Law of Torts* 504505 (1926). *See also* Feezer, "Intervening Crime and Liability for Negligence," 24 Minn.L. Rev. 635, 648 (1939–40) ("It cannot fairly be said as a matter of law, and should not be categorically laid down, that crime is entirely unexpectable in any situation where the stage set by the original wrongdoer's negligence affords an opportunity for crime to any person with criminal impulse who may happen to appear on the scene.")

ble use," the court declared that the normal use of a product can include its criminal use. The case arose because two individuals were injured when the tread on one of the tires of the sports car they were driving at the time of the accident separated from the body of the car. The Fifth Circuit found that when the accident occurred the car was in normal use, even though the driver at that time was highly intoxicated and driving in excess of 100 miles per hour. Commenting on the driver's illegal use of the car, the court stated: "It would be blinking reality in this case to hold that Ford could not reasonably have expected purchasers of any automobile, much less one equipped and marketed as was the Cougar, to transgress our nation's speeding laws periodically." *Id.* at 989 n. 4. The analogy here is manifest: if car manufacturers must reasonably expect purchasers of their products to speed periodically, then surely handgun manufacturers must reasonably expect purchasers of their products to kill periodically. Indeed, given the number of deaths caused annually in this country by handguns,[6] any other finding would be patently unreasonable. For this reason, the Court finds that in the context of this case the criminal use of a handgun is, as a matter of law, a normal use of that product. Thus, the defendant's first argument must be rejected.

■ The defendant's other argument cannot reasonably be rejected. This is the argument that marketing handguns for sale to the general public is not "unreasonably dangerous," or, what amounts to the same thing, is not negligence per se. To rebut this argument, the plaintiff would have to show either that no reasonable handgun manufacturer would market its product in the way the defendant did knowing of the risks involved (i.e., knowing that the product would be used as a murder weapon), or that the risks involved are greater than a reasonable buyer would expect. *Welch v. Outboard Marine Corp., supra; Perez v. Ford Motor Co.,* 497 F.2d 82 (5th Cir.1974); *Wade, supra* at 13–15. This, however, is precisely what the plaintiff cannot show.

■ As to the "consumer expectation" theory, common sense requires the Court to find that the risks involved in marketing handguns for sale to the general public are not greater than reasonable consumers expect. Every reasonable consumer that purchases a handgun doubtless knows that the product can be used as a murder weapon. This knowledge, however, in no way deters reasonable consumers from purchasing handguns. The "consumer expectation" theory normally applies in cases where the defendant has failed to attach an adequate warning to its product. *See, e.g., Hunt v. City Stores, Inc., supra;*[7] *Chappuis v. Sears Roebuck & Co.,* 358 So.2d 926 (La.1978).[8] In this case, however, it would be unreasonable to say that a death might have been averted had the Charter Arms Corporation attached an adequate warning to each of its handguns explaining how the product can be used and abused. Contrary to what the plaintiff suggests, such warnings are not likely either to alter consumer buying behavior or to reduce handgun violence. The plaintiff's reliance on the "consumer expectation" theory is therefore misplaced.

**6.** The estimate of the U.S. Department of Justice is 22,000. *See* Turley, *supra,* at 42 (citing *F.B.I. Crime Reports,* 5–21 (1981). Half of these are suspected of being suicides. *Id.* Whether a handgun manufacturer could successfully assert the defense of "victim fault" if sued by an heir of a suicide victim is not an issue before the Court. *See generally Hyde v. Chevron U.S.A., Inc.,* 697 F.2d 614, 622–628 (5th Cir.1983) (discussing "contributory negligence" and "assumption of the risk"); *Ashland Oil, Inc. v. Miller Oil Purchasing Co.,* 678 F.2d 1293, 1308 (5th Cir.1982) (discussing "contributory negligence").

**7.** In *Hunt,* the court found: "Here, the risk of harm [from department store escalators built to industry standards] was known to Otis but not obvious to the public.... Despite knowledge of the danger presented to children in tennis shoes, Otis had not warned of that hazard." *Id.* at 589.

**8.** In *Chappuis,* the court declared: "But when the danger is known to the manufacturers and cannot justifiably be expected to be within the knowledge of users generally, the manufacturer must take reasonable steps to warn the user." *Id.* at 930.

Equally misplaced is the plaintiff's reliance on the "reasonable seller" theory. To explain why, the Court must turn to the right-to-bear-arms provision of the Louisiana State Constitution and to the state legislature's view of that provision. The relevant constitutional provision provides:

> The right of each citizen to keep and bear arms shall not be abridged, but this provision shall not prevent the passage of laws to prohibit the carrying of weapons concealed on the person.

LSA-Const. Art. 1, § 11. *See generally* Hargrave, "The Declaration of Rights of the Louisiana Constitution of 1974," 35 La. L.Rev. 1, 35–37 (1974).[9] Whether or not the right described in this section includes the right to keep and bear handguns is not important here. What is important here is the fact that the Louisiana legislature has neither enacted a statute banning the sale of handguns to the general public nor adopted a joint resolution to amend the Constitution to that effect. Given the prominence of the handgun issue in public debates, the only plausible explanation for the refusal to ban handgun sales to the general public, either by statute or by constitutional amendment, is that a majority of the legislators think such a ban would be undesirable as a matter of public policy. The inference the court should draw from this is clear: the legislature does not think handgun manufacturers act unreasonably (are negligent per se) when they market their product to the general public. To couch this inference in the language of Louisiana products liability law, a majority of the legislators do not think marketing handguns for sale to the general public is an "unreasonably dangerous" activity. Any other view of the legislature's inaction would appear to be implausible.

Admittedly, Louisiana law does "hold to a high degree of care persons dealing in, handling or distributing highly dangerous substances and instrumentalities such as . . . firearms . . . ." *Holland v. St. Paul Mercury Insurance Co.,* 135 So.2d 145, 154 (La. App.1961). Yet this in no way supports the plaintiff's position. For in holding that dealers and distributors of firearms must exercise a high degree of care, courts are saying, at least by negative implication, that there is some standard of behavior dealers and distributors can follow and, in so doing, act reasonably. No doubt, the plaintiff can argue in response that, while dealers and distributors can act reasonably, they fail to do so when they market handguns for sale to the general public. Absent the legislature's inaction, this argument might be plausible. Given that inaction, however, the argument is not.

Since Louisiana courts must defer to the legislature on such matters, *see,* e.g., *Transway, Inc. v. Louisiana Public Service Commission,* 296 So.2d 305, 309 (La.1974); *Arceneaux v. Hawkins,* 376 So.2d 362, 366 (La.App.1979), so too must this Court. *Cole v. Elliott Equipment Corp.,* 653 F.2d 1031 (5th Cir.1981). Every federal court exercising diversity jurisdiction is "in effect, sitting as a state court." *Id.* at 1034, *quoting Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967). This Court's duty is "to make a considered 'educated guess' as to what decision would be reached by the Supreme Court [of Louisiana] with respect to the policies involved in this litigation under the facts of the present case." *Ann Arbor Trust Co. v. North American Company for Life and Health Insurance,* 527 F.2d 526, 527 (6th Cir.1975). With this in mind, the Court here finds that, in light of the facts and arguments discussed above, the plaintiff has no basis for recovery under the Louisiana law of products liability.

---

**9.** The defendant argues that a decision to hold the company liable on either theory of recovery would violate U.S. Const. amend. II and LSA-Const. Art. 1, § 11. This argument is specious. It mistakenly equates the imposition of liability on handgun manufacturers with the deprivation of an alleged constitutional right to own and use handguns. Even assuming such a right exists under both the U.S. Constitution and the Louisiana State Constitution, requiring handgun manufacturers to act virtually at their peril is not the same thing as banning handguns. If liability is ultimately imposed, manufacturers will still be free to make and market handguns and consumers will still be free to purchase them.

The plaintiff's alternate theory of recovery is based on the law governing ultrahazardous or abnormally dangerous activities. In the past, Louisiana courts have found a number of activities to be ultrahazardous. *See, e.g., Langlois v. Allied Chemical Corp., supra* (storage of toxic gas); *Craig v. Montelepre Realty Co.,* 252 La. 502, 211 So.2d 627 (1968) (pile driving); *Gotreaux v. Gary,* 232 La. 373, 94 So.2d 293 (1957) (crop dusting by airplanes); *Fontenot v. Magnolia Petroleum Co.,* 227 La. 866, 80 So.2d 845 (1955) (blasting with explosives); *Rosenblath v. Louisiana Bank & Trust Co.,* 432 So.2d 285 (La.App.1983) (demolition of buildings with ball, crane, and blasting). When courts have found that an activity fits into this category, they

> have imposed an *absolute* liability ... which virtually makes the enterpriser an insurer. The enterpriser, whether or not negligent in any respect, causes the damage, and the injured party recovers simply by proving damage and causation.
>
> In these cases of absolute liability (or liability without proof of negligence or other fault), liability is imposed as a matter of policy when harm results from the risks inherent in the nature of the activity. The steps taken by the enterpriser to protect others from the inherent risks of the activity are not relevant to the determination of liability.

*Kent v. Gulf States Utilities Co., supra* at 498 (emphasis in original).[10] No Louisiana court has held, however, that the marketing of handguns for sale to the general public is an ultrahazardous activity. Indeed, no Louisiana court has held that any activity associated with handguns is an ultrahazardous activity. Still, this is not dispositive. For no Louisiana court has held to the contrary, either.

What the courts have said, repeatedly, although only in dicta as far as handguns are concerned, is this:

> [There is a] universally recognized rule of law (followed in this state) which holds to a high degree of care persons dealing in, handling or distributing highly dangerous substances and instrumentalities such as explosives, electricity, *firearms,* combustibles and fireworks.

*Holland v. St. Paul Mercury Insurance Co.,* 135 So.2d 145, 154 (La.App.1961) (emphasis added). *See also Prescott v. Central Contract Co.,* 162 La. 885, 111 So. 269 (1927); *Cambridge Mutual Fire Insurance Co. v. State Farm Fire & Casualty Co.,* 405 So.2d 587 (La.App.1981); *Miller v. Lambert,* 380 So.2d 695 (La.App.1980); *Waters v. Southern Farm Bureau Casualty Insurance Co.,* 212 So.2d 487 (La.App.1968), *writ refused,* 252 La. 900, 214 So.2d 720 (1968). Yet, given the way Louisiana law has developed, this statement is misleading. It suggests that all dealers, handlers, and distributors that engage in the enumerated activities are held to a negligence standard. But such is not the case. People that distribute electricity, for example, are subject to strict liability under Article 2317. *Kent v. Gulf States Utilities Co., supra* at 499. Similarly, people that blast with explosives are subject to "absolute" liability under the law governing ultrahazardous activities. *Id.* at 498. Owing to these inconsistencies, the Court has no alternative but to examine the defendant's marketing practices in light of the law of ultra-hazardous activities.

An ultrahazardous activity is not an unreasonably dangerous activity. It is an activity "in which the risk may be altogether reasonable and still high enough that the party ought not undertake the activity without assuming the consequences." *Kent v. Gulf States Utilities Co., supra,* at 498. To determine whether an activity fits this description, the Louisiana Supreme Court has articulated the following rule:

> The [ultrahazardous] activities of man for which he may be held liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and gravity of harm,

---

**10.** *But cf.* Palmer, "In Quest of a Strict Liability Standard Under the Code," 56 Tul.L.Rev. 1317, 1317–18 (1982) (noting that "absolute liability" cannot really be absolute if any defenses are allowed).

and a consideration of individual and societal rights and obligations.

*Langlois v. Allied Chemical Corp., supra* 249 So.2d at 140 (citation omitted). Even a cursory reading of this rule reveals its vagueness. Fortunately, though, the court did not simply articulate the rule and say no more. To support its reliance on the rule, the court referred to the *Restatement* provisions that apply to ultrahazardous activities. *Id.* 249 So.2d at 139 n. 13. Although those provisions are likewise rather vague, they are nonetheless sufficiently clear to provide this Court with the guidance it needs. *See Ashland Oil, Inc. v. Miller Oil Purchasing Co., supra,* at 1307–1308.

 The relevant sections in the *Restatement* are §§ 519 and 520.[11] Section 519 reads as follows:

(1) One who carries on an abnormally dangerous [or ultrahazardous] activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which

makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519. Section 520 contains a list of "the factors to be considered in determining whether an activity is abnormally dangerous." *Id.* at § 519 comment b. Those factors are:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

*Id.* at § 520. In considering these factors, a court should be aware that "[a]ny one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily." *Id.* at § 520 comment f.[12]

---

**11.** In a number of states, these sections have been adopted by judicial decision. *See* e.g., *Clark-Aiken Corp. v. Cromwell-Wright Corp.,* 367 Mass. 70, 323 N.E.2d 876 (1975); *Doundoulakis v. Town of Hampstead,* 42 N.Y.2d 440, 398 N.Y.S.2d 401, 368 N.E.2d 24 (1977); *McLane v. Northwest Natural Gas Co.,* 255 Or. 324, 467 P.2d 635 (1970); *Pacific Nw. Bell Tel. Co. v. Port of Seattle,* 80 Wash.2d 59, 491 P.2d 1037 (1971). *See also Yukon Equipment, Inc. v. Fireman's Fund Insurance Co.,* 585 P.2d 1206 (Alaska 1978); *Cities Service Co. v. State,* 312 So.2d 799 (Fla.App.1975); *Yommer v. McKenzie,* 255 Md. 220, 257 A.2d 138 (1969).

**12.** Compare § 520 with § 402A comment k, which discusses "unavoidably unsafe products":

There are some products which, in the present state of human knowledge are quite incapable of being made safe for their intended or ordinary use .... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given where the situation calls for it, is not to be held to strict liability for unfortunate consequences attend-

ing their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

The defendant maintains that handguns are an "unavoidably unsafe product" and that, because of this, no liability should be imposed. Under Louisiana law, however, showing that a product is unavoidably unsafe is never sufficient to escape liability. So says *Langlois v. Allied Chemical Corp., supra.* The product at issue in that case was toxic gas—clearly an unavoidably unsafe product. This fact, however, did not prevent the court from imposing liability. *Id.* at 140. *See also Gonzalez v. Virginia-Carolina Chemical Co.,* 239 F.Supp. 567 (E.D.S.C.1965) (chemical crop dust); *Chapman Chemical Co. v. Taylor,* 215 Ark. 630, 222 S.W.2d 820 (1949) (same). The result here is the same. The outcome does not depend on whether handguns are unavoidably unsafe. That they are is obvious. The outcome depends, instead, on the results of two inquiries: "Is this unavoidably unsafe product unreasonably dangerous to normal use?" and "Is the marketing of this unavoidably unsafe product to the general public an ultrahazardous activi-

■ The drafters' discussion of each factor is illuminating. Here, in part, is what they say about the first two, (a) and (b):

The harm threatened must be major in degree, and sufficiently serious in its possible consequences to justify holding the defendant strictly responsible for subjecting others to an unusual risk. It is not enough that there is a recognizable risk of some relatively slight harm, ... If the potential harm is sufficiently great, however, as in the case of a nuclear explosion, the likelihood that it will take place may be comparatively slight and yet the activity be regarded as abnormally dangerous.

*Id.* at comment g. The plaintiff in this case argues, in effect, that the harm threatened by the defendant's marketing practices—namely, serious physical injuries and deaths—is "major in degree" and "sufficiently great." She also argues that the likelihood of such harms occurring is far from "relatively slight." The ultimate validity of these arguments depends on whether the plaintiff can establish a causal connection between the harms threatened and the injury sustained. That issue is for a jury to decide. At this point, however, the Court cannot find as a matter of law that the plaintiff's arguments are without merit.

Factor (c) concerns whether the party engaging in the allegedly ultrahazardous or abnormally dangerous activity can eliminate the risk of serious harm by exercising reasonable care. Again, the drafters' discussion is illuminating:

Most ordinary activities can be made entirely safe by the taking of all reasonable precautions; and when safety cannot be attained by the exercising of due care there is reason to regard the danger as an abnormal one.

\* \* \* \* \* \*

... It is not necessary, for the factor in clause (c) to apply, that the risk be one that no conceivable precautions of care could eliminate. What is referred to here is the unavoidable risk remaining in the activity, even though the actor has taken all reasonable precautions in advance and has exercised all reasonable care in his operation, so that he is not negligent. The utility of his conduct may be such that he is socially justified in proceeding with his activity, but the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it.

*Id.* at comment h. According to the plaintiff, marketing handguns for sale to the general public is not an activity that "can be made entirely safe by the taking of all reasonable precautions." In saying this, the plaintiff is not suggesting that no way exists for the defendant to reduce the risk of harm. She readily acknowledges that the defendant could reduce the risk by altering its current marketing practices—by restricting sales to, say, law enforcement agencies and sporting clubs. But this, she says, is beside the point. For what is ultrahazardous or abnormally dangerous, in her view, is not the marketing of handguns per se but the marketing of handguns to the general public. Her point is that, so long as the defendant continues its current marketing practices, no amount of due care will significantly reduce the risk of harm. This argument, like the plaintiff's argument in connection with factors (a) and (b), is not without legal merit.

The fourth factor, (d), is "common usage." In the context of this case, the paramount question regarding this factor is whether handgun use is an activity that "is customarily carried on by the great mass of mankind or by many people in the community." *Id.* at comment i. The example discussed in the *Restatement* focuses on motor vehicles:

Thus automobiles have come into such general use that their operation is a matter of common usage. This, notwithstanding the residue of unavoidable risk of serious harm that may result even

ty?" To escape liability, the defendant must show both that its product is not unreasonably dangerous to normal use and that its method of marketing the product is not ultrahazardous.

from their careful operation, is sufficient to prevent their use from being regarded as an abnormally dangerous activity. On the other hand, the operation of a tank or any other [very large] motor vehicle . . . is not yet a usual activity for many people, and therefore the operation of such a vehicle may be abnormally dangerous.

*Id.* Operating an automobile is just one potentially dangerous activity that is also a common activity. Consuming liquor is another: it, too, "is customarily carried on by the great mass of mankind or by many people in the community." The same holds true for the use of knives; many people use them every evening at the dinner table. Handgun use, on the other hand, appears to fit into a different category. Handguns are not an item of "general use"; they are an item of extraordinary or abnormal use. Many people in the community are likely on an average day to operate an automobile, to consume a drink, or to use a knife. Few people, however, are likely to use a handgun except in highly unusual circumstances—when attacked by a criminal assailant, for example, or when acting as a criminal assailant. Thus, the Court cannot conclude that the operation of handguns is "a matter of common usage."

To the extent the "locality" factor, (e), is germane here, it too supports the plaintiff's claim. Normally, this factor, which concerns "the place where [the activity] is carried on," pertains to such activities as blasting with explosives, crop dusting, and transporting highly inflammable liquids. *Id.* at comment j. Whether or not these activities are ultrahazardous depends on where they are conducted. If conducted in a densely populated area, they are likely to be ultrahazardous. If conducted in a desert, they are not. This is why the location of the activity is critical. In this case, however, the plaintiff contends that there is no place in the United States where handguns can be safely marketed for sale to the general public. This may or may not be true. The important point, for the purposes of this motion, is that the Court cannot say either that the plaintiff's contention is im-

material or that no genuine dispute about it exists.

The final factor, (f), concerns the value of the activity to the community. Regarding this factor, the drafters state:

Even though the activity involves a serious risk of harm that cannot be eliminated with reasonable care and it is not a matter of common usage, its value to the community may be such that the danger will not be regarded as an abnormal one. This is true particularly when the community is largely devoted to the dangerous enterprise and its prosperity largely depends upon it.

\* \* \* \* \* \*

Thus in Texas and Oklahoma, a properly conducted oil well or gas well, at least in a rural area, is not regarded as abnormally dangerous, while a different conclusion has been reached in Kansas and Indiana.

*Id.* at comment k. The plaintiff argues that marketing handguns for sale to the general public has no utility at all. Quite clearly, this is an exaggeration. For the social utility of an activity that produces jobs and enables some people to defend themselves cannot be denied. Furthermore, the legislature, by not banning handguns sales to the general public, either by statute or by constitutional amendment, has indicated that it thinks the social utility of the defendant's marketing practices is at least as great as the social disutility of those practices. Still, none of these facts about the value of the defendant's marketing practices leads to the conclusion that "the community is largely devoted to the [defendant's] dangerous enterprise and [that the community's] prosperity largely depends upon it."

The defendant maintains that, if liability is imposed in this case, no company that markets handguns for sale to the general public will be able in the future to obtain insurance. The result, according to the defendant, will be catastrophic for handgun manufacturers: all such companies will be forced either to alter their marketing practices radically or to go out of business. This argument has a ring of plausibility to

it. At the same time, however, it is highly speculative. One problem is that the defendant has introduced no evidence to support the argument. Another problem is that the defendant ignores the impact LSA–C.C. art. 3536 would have on the imposition of liability. That article contains a one-year prescription period for all "damages . . . resulting from offenses or quasi-offenses." Thus, even if liability is imposed here, neither the defendant nor its competitors can be held liable in other similar cases, unless the plaintiff has filed suit within a year following the date of death.

Perhaps the most significant fact the defendant ignores is that increased insurance costs can be passed on to consumers in the form of higher prices for handguns. The people who benefit most from marketing practices like the defendant's are handgun manufacturers and handgun purchasers. Innocent victims rarely, if ever, are beneficiaries. Consequently, it hardly seems unfair to require manufacturers and purchasers, rather than innocent victims, to pay for the risks those practices entail. *See,* e.g., Fletcher, "Fairness and Utility in Tort Theory," 85 Harv.L.Rev. 537, 546 (1972); Sharp, "Aristotle, Justice and Enterprise Liability in the Law of Torts," 34 U.Toronto Faculty L.Rev. 84, 90 (1976). Furthermore, economic efficiency seems to require the same result. In an important article on ultrahazardous activities and risk allocation, Professor Clarence Morris makes just this point. Morris, "Hazardous Enterprises and Risk Bearing Capacity," 61 Yale L.J. 1172 (1952). In his view, "the avowed goal of the absolute liability approach is allocation of loss to the party better equipped to pass it on to the public: the superior risk bearer." *Id.* at 1176; *See also* Calabresi & Hirschoft, "Toward a Test for Strict Liability," 81 Yale L.J. 1055, 1060 n. 19 (1972); Diamond, "Eliminating the 'Defect' in Design Strict Products Liability Theory," 34 Hastings L.J. 529 (1983); England, "The System Builders: A Critical Appraisal of Modern Tort Theory," 9 J.Legal Stud. 27, 69 (1980).

Professor Morris discusses a variety of examples to show that the defendant is not always the superior risk bearer in an ultrahazardous activity case. Here is what he says, however, about bodily injury and risk-bearing capacity:

> The financial burden of disabling personal injury overwhelms most people. While many can bear the cost of minor injury, prolonged infirmity and extended medical expense often exceed the financial competence of common men. Unless [common man] happens to be rich or covered by one of the more generous workmen's compensation plans, he will probably bear the risk less easily than Enterpriser. The preponderant likelihood is that Enterpriser is the better risk bearer of the two.

*Id.* at 1177.

Another prominent legal scholar, Wex Malone, in an article on Louisiana tort law, says much the same thing:

> If, as would seem proper, the inescapable accident cost of a given hazardous activity ought to be so allocated by law that this cost can ultimately be passed on in dilution as a charge upon the numerous consumers or users of the goods or services produced by the activity, then it would seem that the enterprise—the individual or corporation that conducts the activity—is the appropriate unit that should initially shoulder the cost burden; for the enterpriser is in the best position to convert the anticipated accident charge into an item of capital cost, to insure against it, and to transfer the resulting premium cost into the price structure of the goods or services the activity produces. Furthermore, it is only the enterpriser who is in a position to adopt or to devise those precautionary measures that may serve in the future to minimize the chance of a recurrence of the tragedy.

Malone, "The Work of the Louisiana Appellate Courts for the 1969–70 Term—Torts," 31 La.L.Rev. 231, 241 (1971).[13] Thus, both

---

**13.** *See also Id.* at 245 ("The act of launching a dangerous business or operation in the face of certain although unavoidable chance of injury to the public can appropriately be characteriz-ed as 'fault' [under Article 2315], even though society tolerates and even encourages the activity as so conducted."); Yiannopoulos, "Civil Responsibility in the Framework of Vicinage:

fairness and economic efficiency suggest that the community would be better off if the defendant's marketing practices were classified as ultrahazardous. The Court, though, cannot reach that conclusion on this motion.[14] All the Court can conclude here is that the defendant's marketing practices are not so valuable to the community that they should automatically be exempt from the ultrahazardous classification.

At this point, a brief summary is in order. The Court has now examined all of the factors contained in § 520 of the *Restatement* in light of the facts in this case. In so doing, the Court has shown that a genuine dispute exists in connection with each factor. Two factors, however, require special emphasis here in order to delimit the scope both of the plaintiff's claim and of similar claims that might be brought against other manufacturers. The first is factor (c), "common usage." The second is factor (f), "value to the community." If the defendant can eventually show either that the operation of handguns is a matter of common usage or that the social utility of the company's marketing practices is signifi-

cantly greater than the social disutility of those practices, the plaintiff is likely to lose on the merits. On the evidence produced so far, however, the defendant has failed to make the requisite showing. Since the Court has no reason to suspect that its analysis is in any way incompatible with *Langlois v. Allied Chemical Corp., supra,* the leading Louisiana case on ultrahazardous activities, the Court cannot find as a matter of law that the defendant's marketing practices are exempt from being classified as ultrahazardous.

Yet this is not the end of the matter. Still to be considered are the Charter Arms Corporation's defenses. Under Louisiana law, no defendant can be held strictly liable for any injury "caused by the fault of the victim, by the fault of a third person, or by an irresistible force." *Jones v. The City of Baton Rouge-Parish of East Baton Rouge,* 388 So.2d 737, 740 (La.1980). *See also Loescher v. Parr,* 324 So.2d 441 (La.1975); *Holland v. Buckley,* 305 So.2d 113 (La.1974). The Charter Arms Corporation contends that this rule obviously exonerates the company from liability since Kathy Newman's

---

Articles 667–69 and 2315 of the Civil Code," 48 Tulane L.Rev. 195, 200, 232, 237 (1974) (same). *Cf.* Tate, "Techniques of Judicial Interpretation in Louisiana," 22 La.L.Rev. 727, 728, 739–743 (1962) (discussing legal commentary as a source of law in civil law jurisdictions); Barham, "Methodology of the Civil Law in Louisiana," 50 Tulane L.Rev. 474, 483–487 (1976) (same).

The principle of economic efficiency also justifies an important distinction that needs to be made here. In the ordinary case involving an ultrahazardous activity, liability is imposed on the person that uses the dangerous product, not on the person that markets it. Pile driving provides a good illustration. It is the person that engages in pile driving, not the person that markets pile-driving equipment, that is held liable when an injury occurs. *See,* e.g., *Craig v. Montelepre Realty Co., supra.* By contrast, in the case here the plaintiff claims that both the user of the product and the marketer of it are or ought to be potentially liable. This claim has merit for the following reason. In the ordinary ultrahazardous-activity case, the person that uses the product is just as likely as the person that markets it to be a good risk bearer. The plaintiff is therefore not likely to be any worse off by having a cause of action against the user but not against the marketer. The

situation is dramatically different, on the other hand, in a case involving handguns. If the plaintiff in such a case cannot proceed against the person that marketed the weapon, she is likely to be left without an effective remedy. Her right to receive compensation will probably be a right in name only, since criminals are notoriously poor risk bearers. (Note that the defendant's capacity to bear the risk in this case will be even greater if the defendant can share the risk with other persons that play a role in making handguns and handgun ammunition available to the general public. *See* footnote 3, *supra.* )

**14.** Whether the decision about how to classify the defendant's activities is for the Court or a jury to make is an issue to be resolved at some future date. To resolve the issue, the Court will have to consider both the relevant jurisprudence under Louisiana law and § 520 comment 1 of the Restatement, which recommends that courts rather than juries determine whether or not an activity is ultrahazardous. *See, generally,* O'Neal v. International Paper Co., —— F.2d —— (5th Cir.1983 Slip Op. 83–4125); *Ashland Oil, Inc. v. Miller Oil Purchasing Co., supra,* at 1308; *Yukon Equipment, Inc. v. Fireman's Fund Insurance Co., supra,* at 1210; *McLane v. Northwest Natural Gas Co., supra,* at 637.

death was not caused by the company but by a third person—Willie Watson. Not surprisingly, however, the matter is neither as obvious as the defendant contends nor as clear as appearances suggest.

In *Olsen v. Shell Oil Co.,* 365 So.2d 1285 (La.1979), the Louisiana Supreme Court held, in a scholarly opinion written by Judge (then Justice) Tate, that a defendant can escape liability by proving third-person fault only if the third-person fault "is the sole cause of the damage," *Id.* at 1293; that is, only if "the intervening third person's act or fault is in the nature of a superseding cause in Anglo-American tort law. See Restatement of Torts, 2d, Sections 440–453 (1965)." *Id.* at 1293 n. 15.[15] Louisiana courts writing since *Olsen* have followed the same rule. *See, e.g., Ruffo v. Schwegmann Brothers Giant Supermarkets, Inc.,* 424 So.2d 470, 474 (La.App.1982); *Brown v. Soupenne,* 416 So.2d 170, 173 (La.App.1982); *Robertson v. Parish of East Baton Rouge,* 415 So.2d 365, 367 (La.App.1982). So, too, has the Fifth Circuit in cases construing Louisiana law. *See Hyde v. Chevron U.S.A., Inc.,* 697 F.2d 614, 620 (5th Cir. 1983); *Rodrigue v. Dixilyn Corp.,* 620 F.2d 537, 542 (5th Cir.1980); *Ramos v. Liberty Mutual Insurance Co.,* 615 F.2d 334, 342 (5th Cir.1980).

Two of the Louisiana appellate courts that have followed *Olsen* have interpreted the case rather narrowly. According to both, *Olsen* says that a defendant can exonerate himself from liability in a strict liability suit by showing that the third person who caused the injury was a "stranger," someone who acted without the defendant's consent. *Brown v. Soupenne, supra; Robertson v. Parish of East Baton Rouge, supra.* The Fifth Circuit has in dicta reached the same conclusion in one case but the opposite conclusion in another. In *Hyde v. Chevron U.S.A., Inc., supra,* the court stated: "The owner [of a thing] is absolved from liabiiity by three defenses . . . [one of

which is] the fault of some third person (who must be a 'stranger' rather than a person acting with the consent of the owner)." *Id.* at 620. In *Ramos v. Liberty Mutual Insurance Co., supra,* the court stated: "Only where the third person's actions are the sole cause of the damages, in the nature of a superseding cause, will the owner of a thing be exonerated. When the 'third person' is a stranger, not one acting with the owner's consent, the owner cannot avoid 2322 liability." *Id.* at 342.

■ For several reasons, the Court here finds the *Ramos* court's interpretation of the "sole cause" rule more consistent with *Olsen.* The first reason can be gleaned from what the *Olsen* court actually said regarding strangers:

> The fault of a 'third person' which exonerates . . . is that which is the sole cause of the damages, of the nature of an irresistible and unforeseen occurrence—i.e., where the damage resulting has no causal relationship whatsoever to the fault of the owner in failing to keep his building in repair, *and* where the 'third person' is a stranger rather than a person acting with the consent of the owner in the performance of the owner's non-delegable duty to keep his building in repair.

*Olsen v. Shell Oil Co., supra,* at 1293–94 (*citing* Restatement (Second) of Torts 66 440–453) (emphasis added). By using 'and' rather than 'or,' the conjunctive rather than the disjunctive, the court indicated that it is necessary but not sufficient for a party claiming this defense to show that the third person was a stranger. According to this interpretation, the defendant in *Olsen* could not have established the defense simply by showing that the third person involved was a stranger; the defendant also had to show that the risk of harm it created by allowing its building to fall into disrepair in no way contributed to the plaintiff's injury. By analogy, the defendant in this case must show both that Willie Watson was a stran-

---

**15.** Although *Olsen* was decided under LSA–CC art. 2322, "the legal fault of an owner under Article 2322 is similar to the legal fault of the owner or guardian under Article 2317." *Hyde v. Chevron U.S.A., Inc.,* 697 F.2d 614, 620 (1980) (citation omitted). What's more, the

legal fault of the owner or guardian under Article 2317 is similar to the legal fault of a manufacturer under the Louisiana law governing products liability and ultrahazardous activities. *See Kent v. Gulf States Utilities Co., supra* at 496–499.

ger—clearly an easy showing to make—and that the risk of harm it created by marketing handguns for sale to the general public in no way contributed to Kathy Newman's death. The defendant cannot simply invoke the so-called "stranger" rule and thereby escape liability.

The Louisiana Supreme Court recently provided another reason for adopting the *Ramos* court's interpretation. In *Kent v. Gulf States Utilities Co., supra,* the court made the following comment:

> It is noteworthy that, in each of the activities placed in [the ultrahazardous activity] category by decisions of Louisiana courts, the enterpriser is almost invariably the sole cause of the damage and the victim seldom has the ability to protect himself. No decisions have placed in this category any activities in which the victim or a third person can reasonably be expected to be a contributing factor in the causation of damages with any degree of frequency.

*Id.* at 499 n. 8. This statement does not distinguish between strangers and other persons. It suggests, instead, that the Louisiana law governing ultrahazardous activities is still unsettled as to a defendant's liability for damages caused by third-person-strangers. Had the issue already been settled by the time *Kent* was decided, the court could easily have said so.

The final, and perhaps most important, reason for following *Ramos* stems from the fact that *Olsen* bases the third-person defense on §§ 440–453 of the Restatement. Those sections, like the Louisiana Supreme Court in *Kent,* draw no distinction between strangers and other persons. The focus of those sections, or at least of the sections relevant to this case, is almost exclusively on the foreseeability of the intervening act or force that creates or increases the risk of harm. Given this focus, the distinction between strangers and other persons is irrelevant.

Having concluded that the Charter Arms Corporation cannot escape liability simply by showing that Willie Watson was a "stranger," the Court will now turn to the Restatement sections *Olsen* requires the Court to examine. The relevant sections are 440 and 448. Section 440 defines the term "superseding cause":

> A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

Restatement (Second) of Torts § 440 (1965). Section 448 contains one of the rules to be used in determining whether a given intervening act or force is a superseding cause:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless* the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

*Id.* at § 448 (1965) (emphasis added).[16]

These sections of the Restatement discuss "superseding cause" only in terms of an act or force that exonerates a defendant from liability for his own negligence. They say that a negligent defendant can be held liable only if the intervention by a third

---

**16.** Comment c of § 448 states that "[An] actor's conduct may be negligent solely because he should have recognized that it would expose the person, land, or chattels, of another to an unreasonable risk of criminal aggression. If so, it necessarily follows that the fact that the harm is done by such criminal aggression cannot relieve the actor from liability (see § 449)." Section 449 provides:

> If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.

These excerpts from the Restatement are not relevant here because the Court finds above that marketing handguns to the general public is not negligence per se. The Court quotes the excerpts here only to avoid confusion and misunderstanding.

person is foreseeable. They do not say, however, whether the same rule applies in a strict liability case, where the defendant's negligence is not an issue.[17] *Olsen* states that the same rule applies in both cases, although the actual holding in *Olsen* is narrower. Unlike Willie Watson, the "third person" that contributed to the injury in *Olsen* was only negligent. No party in *Olsen* appears to have alleged, nor did the court there find, that the third person's conduct was intentionally tortious or criminal. Thus, the facts in *Olsen* did not require the court to discuss, much less to expand the scope of, § 448. Since the court cited no authority in support of its claim that a broad version of that section is part of Louisiana's law of strict liability, the court's claim was dicta. Even so, in the opinion of this Court, that dicta ought to be followed in this case.[18] The Charter Arms

Corporation mentions no standard the Court might use to draw a principled distinction between acts of a third person that are only negligent and acts of a third person that are intentionally tortious or criminal. Nor has the Court, as a result of its own extensive research, succeeded in identifying such a standard. The critical question, then, on this motion for summary judgment, is not whether Willie Watson's conduct was the sole cause or a superseding cause of Kathy Newman's death. That question, as a matter of law, is for a jury to answer. What a jury must decide is whether "the defendant's [activities had] something to do with the harm," *Hill v. Lundin & Associates, Inc.,* 260 La. 542, 256 So.2d 620, 622 (La.1972); *Jones v. Robbins,* 289 So.2d 104, 106 (La.1974);[19] or were "a substantial factor contributing to . . . the injury." *Frank v. Pitre,* 353 So.2d 1293, 1296

---

**17.** Section 522 of the Restatement (Second) of Torts provides:

> One carrying on an abnormally dangerous activity is subject to strict liability for the resulting harm although it is caused by the unexpectable
> (a) innocent, negligent, or reckless conduct of a third person,
> (b) action of an animal, or
> (c) operation of a force of nature.

The caveat to § 522 reads:

> The Institute expresses no opinion as to whether the fact that the harm is done by an act of a third person that is not only deliberate but also intended to bring about the harm, relieves from liability one who carries on an abnormally dangerous activity.

Under Louisiana law, the caveat to § 522 seemingly cannot be reconciled with the principle that underlies both that section and §§ 519 and 520. The Fifth Circuit recently enunciated this principle in *Ashland Oil, Inc. v. Miller Oil Purchasing Co., supra.* The court there stated, in language borrowed from the lower court's opinion, written by the late Judge Jack M. Gordon, that:

> The principle underlying this cause of action [based on the law of abnormally dangerous activities] is that those engaged in such activit[ies] have, for the furtherance of their own purposes, created an inordinate risk. Should this risk be realized and a real injury sustained, it would be immaterial that the harm occurred through the unexpected action of another party.

*Id.* at 1308. This statement appears to justify, perhaps even to require, this Court to find that Willie Watson's actions do not relieve the de-

fendant from liability. That the defendant is a manufacturer is irrelevant, since the rationale that underlies the law of products liability in Louisiana is the same as that which underlies the law of ultrahazardous activities. *See Carpenter v. State Farm Fire and Casualty Co.,* 411 So.2d 1206, 1210 (La.App.1982).

**18.** It is worth noting here that similar rules are applied in other contexts and that the principles and policies underlying these rules are similar to the principles and policies that underlie the rule being applied in this case. *See,* e.g., *Ryle v. Potter,* 413 So.2d 649 (La.App. 1982) (parents' liability for acts of their children); *Flannigan v. Valliant,* 400 So.2d 225 (La.App.1981) *writ denied,* 406 So.2d 611 (La. 1981) (same); *Rennier v. Johnson,* 410 So.2d 1149 (La.App.1981) *writ denied,* 412 So.2d 1115 (La.1982) (employer's liability for intentional torts of his employee); *Weysham v. New Orleans Public Service, Inc.,* 385 So.2d 19 (La. App.1980) *writ denied,* 392 So.2d 690 (La.1980) (same); *Vredenburg v. Behan,* 33 La.Ann. 627, 639–40 (1881) (owner of dangerous animal liable for damages when animal attacked a man after being incited by a boy).

**19.** *See also* Green, "The Causal Relation Issue in Negligence Law," 60 Mich.L.Rev. 543, 557, and 569 n. 77 (1962); Malone, "Ruminations on Cause-In-Fact," 9 Stan.L.Rev. 60, 66, 88–94 (1956); Robertson, "Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin and Associates, Inc.," 34 La.L.Rev. 1 (1973); Robinson, "Multiple Causation in Tort Law: Reflections on the *DES* Cases," 68 Va.L. Rev. 713 (1982).

(La.1977) (Tate, J., concurring); *Taylor v. State,* 431 So.2d 876, 879 (La.App.1983).[20] The critical question here is: What are the legal limits of a handgun manufacturer's liability for the criminal acts of third persons? The answer to this question must be found in Louisiana's law of products liability and ultrahazardous activities. After carefully examining the law in these two areas, the Court has concluded that the plaintiff may proceed with her claim under the law of ultrahazardous activities but that she has no claim under the law of products liability.

In reaching this conclusion, the Court is not unmindful of the fact that handgun violence is a pressing political issue. Some will doubtless argue that it is solely a political issue. Those who do, however, will be mistaken. They will have overlooked two significant facts about Louisiana jurisprudence. The first can be found in *Entrevia v. Hood,* 427 So.2d 1146, 1149 (La.1983):

> Except in the clearest of cases, it is necessary for the judge, in shaping his decision about how the law applies to the facts, to consider the particular situation from the same standpoint as would a legislator regulating the matter. Geny, [*Method of Interpretation and Sources of Private Positive Law* § 173 (Louisiana State Law Institute trans. 2d ed. 1963)]; Cf. Id. at §§ 175, 183. Although the judge, unlike the legislator, is constrained by the concrete problem before him and the ambit of his limited authority, he nevertheless must consider the moral, social and economic as well as the ideals of justice in reading an intelligent and responsible decision. *See* Geny, *supra,* § 173–174; Cf. Id. at § 170. *See also* Dixon, "Judicial Method in Interpretation of Law in Louisiana," 42 La.L.Rev. 1661, 1678 (1983); J. Cueto-Rua, *Judicial Method of Interpretation of the Law,* 277 (1981). As this court has noted in relation to other forms of strict liability under the civil code, the

activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations. *Langlois v. Allied Chemical Corporation,* 258 La. 1067, 1084, 249 So.2d 133, 140 (1970).

*See also* R. Dworkin, *Taking Rights Seriously* 81–130 (1977); H.L.A. Hart, *The Concept of Law,* 120–144 (1961); Moore, "The Semantics of Judging," 54 S.Cal.L.Rev. 151 (1981); O'Connell, "Expanding No Fault Beyond Auto Insurance: Some Proposals," 59 Va.L.Rev. 749, 789–790, 825–826 (1973). Tate, "The 'New' Judicial Solution: Occasions for and Limits to Judicial Creativity," 54 Tul.L.Rev. 877 (1979–80).

As this excerpt suggests, much overlap exists under Louisiana law between the role of the courts and the role of the legislature. Indeed, "except in the clearest of cases," courts must resolve a legal dispute "from the same standpoint as would a legislator regulating the matter." *Id.* This is not to say that the courts and the legislature are partners of equal standing in deciding matters of public policy. Far from it. Outside the area of constitutional law, the legislature always has the final word. If the legislature speaks clearly, the courts must defer. It is only when the legislature fails to speak clearly that courts can and "must consider the moral, social, and economic values, as well as the ideal of justice, in reaching an intelligent and responsible decision." *Id.*

This brings us to the second significant fact about Louisiana jurisprudence—namely, that the case here is not one of the "clearest of cases." As indicated above, the legislature has said it thinks the activity of marketing handguns for sale to the general public is a reasonable activity. At the same time, however, the legislature has not said

---

**20.** *See also* W. Prosser, *supra,* at 236–44; Malone, *supra.* The Court recognizes that the two tests referred to in the text may support different results. Even so, the Court need not decide now which test is more appropriate for this case. The point worth emphasizing here is that under either test a jury might reasonably find that the defendant's marketing practices were a cause of Kathy Newman's death. This being so, the Court cannot rule that the law forbids allowing the jury to decide the issue.

whether it thinks a person that engages in such an activity ought or ought not to "[carry it] on at his peril, rather than at the expense of the innocent person who suffers harm from it." Restatement (Second) of Torts, *supra*, at § 520 comment h. This silence, when viewed in connection with *Langlois* and the *Restatement* criteria for ultrahazardous activities, prevents the Court at this point from telling the plaintiff that she is without a legal remedy. The Court cannot say that there is no genuine dispute about material facts. Consequently, the defendant's motion for summary judgment is DENIED.