Jett Edwards PATTERSON, individually and as representatives of the Estate of James Patterson, deceased, Plaintiff,

v.

Rohm GESELLSCHAFT, Heinrich Rohm, Sr., Guenter Rohm, William S. Kirk; and Heinrich Peter Rohm, individually and d/b/a R.G. Industries, Inc., Defendants.

No. CA 3–81–1006–R.

United States District Court, N.D. Texas, Dallas Division.

May 14, 1985.

Windle Turley and John Howie, Dallas, Tex., for plaintiff.

Robert G. Vial, Vial, Hamilton, Dallas, Tex., for defendants except Gesellschaft.

Robert F. Ruckman, Jackson Walker, Dallas, Tex., for Gesellschaft.

Chas. C. Sorrells, Dallas, Tex., for intervenor American Motorist Ins.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

This is a products liability action. The "product" involved is a Rohm .38 caliber revolver, a **"Saturday Night Special."**

However, this handgun is not defective. Admittedly, there was no malfunction because of some manufacturing error; the gun did not lack any necessary safety features; and, it performed exactly as a handgun is intended to do, by firing a bullet with deadly force when the trigger was intentionally pulled.

But unfortunately, this .38 caliber revolver was used in a robbery. And tragically, this gun caused the death of the clerk at *the grocery being robbed*. Consequently, the plaintiff's attorneys make this far-reaching claim: that, under an unconventional and expanded theory of products liability, the mother of the murder victim can recover damages from the manufacturer and the seller of this nondefective revolver because the risks of injury and death that accompany handguns "greatly outweigh any utility they may have" and, consequently, handguns are "unreasonably dangerous." *Restatement (Second) of Torts* § 402A (1965).

■ This claim is totally without merit and totally unsupported by legal precedent. It is a misuse of tort law, a baseless and tortured extension of products liability principles. And, it is an obvious attempt—unwise and unwarranted, **even if understandable**—to ban or restrict handguns through courts and juries, despite the repeated refusals of state legislatures and Congress to pass strong, comprehensive gun-control measures.

Accordingly, this opinion grants summary judgment dismissing this supposed products liability claim.[1]

## 1. FACTUAL BACKGROUND [2]

The handgun in question was manufactured and sold in 1967 by a West German company, the defendant Rohm Gesellschaft ("Rohm"). The gun is a .38 caliber revolver with a four-inch barrel and a total length of only nine inches. It is cheap, small, light, easy to conceal—and, for these reasons, is of the type commonly referred to as "snubbies" or "Saturday Night Specials."

On December 29, 1980—**over 13 years after the handgun was manufactured**—it was used by Berlin Ransom in the attempted robbery of a "7-Eleven" store in Dallas, Texas. During the crime, Ransom shot and killed James Patterson, the clerk at this convenience grocery. Later, Ransom was caught and convicted; he is now confined in the Texas Department of Corrections.[3]

The plaintiff, Jett Edwards Patterson, is the mother of James Patterson, the murder victim. She seeks $500,000 in damages from Rohm, the manufacturer, and from R.G. Industries, a firearm distributor in Florida (and its officers, Heinrich Rohm, Sr., Guenter Rohm, Heinrich Peter Rohm and William Kirk).[4] Although it is conceded that the Rohm .38 revolver did not malfunction—and performed exactly as it was intended—the plaintiff's attorneys nevertheless make these two "products liability" claims:

(i) *Design Defect:* that the handgun was "defective and unreasonably dangerous" in its design because handguns simply pose risks of injury and death that "far outweigh" any social utility they may have.

(ii) *Defect in Distribution:* that the system of distributing and marketing handguns was "defective and unreasonably dangerous" because it is too easy for handguns to be obtained by criminals and others who misuse them.

Both of these theories are baseless. They have been rejected by almost every

---

1. This opinion adopts the well-reasoned and well-researched analysis of this issue in Note, *"Handguns and Product Liability,"* 97 Harv.L. Rev. 1912 (1984).

2. ˙ The summary judgment record consists of the pleadings, the depositions, and the facts stipulated by the parties. See Transcript of Hearing on Motions, pp. 4–8.

3. The record does not establish whether the Rohm .38 revolver was purchased or stolen by Ransom.

4. The defendants R.G. Industries and William Kirk also move for summary judgment on the grounds that, although the gun in question was manufactured in 1967, R.G. Industries did not even exist until 1968 and Kirk was not even employed by that company until 1978. In response, the plaintiff contends that R.G. Industries is the "alter ego" of Rohm Gesellschaft, and that discovery must be permitted before *this* motion for summary judgment is ready for disposition. Because of the result reached by this opinion, it is unnecessary to address these collateral disputes.

court that has considered them.[5] Since it is admitted that there was nothing wrong with the .38 caliber revolver, the plaintiff cannot recover under either of the purported "products liability" claims.

## 2. THE ALLEGED DESIGN DEFECT

### a. The Texas Law

██ The Texas law of products liability controls this diversity case. Texas has adopted the *Restatement (Second) of Torts* § 402A—which provides that one who sells a product "in **a defective condition unreasonably dangerous**" is subject to liability for injuries caused by the product. *Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex.1979); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967).

██ However, under Texas law, the manufacturer is not required to insure that its products are completely safe or that they will not cause injury to anyone.[6] Instead, the manufacturer is liable for injuries resulting from a product only if that product is "defective"—i.e., has a defect in the sense that something is wrong with it. *Syrie v. Knoll International*, 748 F.2d 304 (5th Cir.1984); *Davidson v. Stanadyne, Inc.*, 718 F.2d 1334 (5th Cir.1983). This required defect may be one of three distinct types:

(i) The product may malfunction because of some manufacturing defect.

(ii) The product may be defective because it was sold without sufficient warning or instructions.[7]

(iii) the product may be defective because its basic design is unsafe. See Note, *supra* footnote 1, at 1912–13.[8]

5. This precise issue has not been decided by a Texas court or by the Fifth Circuit. However, every *reported* decision to date—except one—has refused to permit shooting victims to recover damages from handgun manufacturers under "absolute or strict liability principles." See *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir.1984); *Mavilia v. Stoeger Industries*, 574 F.Supp. 107 (D.Mass.1983); *DeRosa v. Remington Arms Co.*, 509 F.Supp. 762 (E.D.N.Y.1981); *Bennet v. Cincinnati Checker Cab Co., Inc.*, 353 F.Supp. 1206 (E.D.Ky.1973); *Linton v. Smith & Wesson*, 127 Ill.App.3d 676, 82 Ill.Dec. 805, 469 N.E.2d 339 (1984); *Robinson v. Howard Brothers of Jackson, Inc*, 372 So.2d 1074 (Miss.1979); *Riordan v. International Armament Corp.*, 81 L 27923 (Circuit Court Cook County, Law Division July 21, 1983) (quoted in *Martin*, 743 F.2d at 1203–04).

The sole exception is *Richman v. Charter Arms Corp.*, 571 F.Supp. 192 (E.D.La.1983). Although this case holds that a nondefective handgun *is not* unreasonably dangerous, it found that selling such a gun to the public *could* constitute "an ultrahazardous activity" under Louisiana law. However, *Richman* is directly contrary to another unreported decision in the same court, the Eastern District of Louisiana (*Perkins v. F.I.E. Corp., Civil Action No. 82–3982*), which was rendered one month before the *Richman* opinion. Moreover, on appeal, these two cases were consolidated and the Fifth Circuit certified the controlling legal questions to the Louisiana Supreme Court. *Perkins v. F.I.E. Corp.*, 743 F.2d 262 (5th Cir.1984). The certified questions are still pending before the Louisiana Supreme Court.

There are also some *unreported* decisions in which trial courts have permitted juries to consider unconventional theories like those advanced by the plaintiff's attorneys in this case. See the Florida state court case cited in *Mavilia*, 574 F.Supp. at 110, and the Texas state court case discussed in Note, *supra* footnote 1, at 1920 (which was tried by the plaintiff's attorneys in this action). However, in the Texas case, there was also a "traditional" products liability claim—a defective safety mechanism—that required submission of the case to the jury.

6. *Syrie v. Knoll International*, 748 F.2d 304, 307 (5th Cir.1984) ("A manufacturer is not an insurer of the product he designs ..."); *Carter v. Massey-Ferguson, Inc.*, 716 F.2d 344, 347 (5th Cir.1983) ("A manufacturer is not obligated to design a completely safe product"); *Hagan v. EZ Mfg. Co.*, 674 F.2d 1047, 1048 (5th Cir.1982) ("We hold that, as a matter of law, the doctrine of products liability does not require a manufacturer to build a failsafe product").

7. Although some commentators have argued that consumers must be warned about the dangers of handgun use and the possibility of handgun theft (see Note, *supra* footnote 1, at 1913), there is no duty to warn of "dangers" that are obvious and commonly known. Obviously, **it is not "necessary to tell a zookeeper to keep his head out of the hippopotamus' mouth."** *Bartkewich v. Billinger*, 432 Pa. 351, 247 A.2d 603, 606 (1968). See *Hagan v. EZ Mfg. Co.*, 674 F.2d at 1052.

8. In *Carter v. Massey-Ferguson*, 716 F.2d at 346, footnote 1, the Fifth Circuit described the three established catagories of defects in this manner: " 'Defective' is a term of art that encompasses several actionable defects. A product can be defective because it is flawed. Flawed products

In cases involving the third type of defect, that of defective design, Texas uses the "risk/utility balancing test": whether the product is "unreasonably" dangerous in the sense that "the danger-in-fact associated with the use of the product outweighs the utility of the product." *Davidson*, 718 F.2d at 1338; *Carter v. Massey-Ferguson, Inc.*, 716 F.2d 344, 347 (5th Cir.1983). Typically, this requires the jury to weigh the risks involved in the defective product against the feasibility and cost of an improved design. For example, if placing the gasoline tank in the center of the car "would reduce the chances of fire in rear-end collisions without creating other risks, significantly reducing performance, or significantly increasing costs, then the risk of the rear-end design outweighs its utility, and the car is defective." See Note, *supra* footnote 1, at 1913–14.

### b. The Contentions of the Plaintiff's Attorneys

In this case, it is admitted that the Rohm .38 caliber revolver did not malfunction and that it did not lack any essential safety features. Nevertheless, the plaintiff's attorneys argue (i) that Texas law no longer requires a showing that the product is defective; (ii) that the word "defective" in § 402A is merely synonymous with the phrase "unreasonably dangerous";[9] and (iii) **that the jury may simply apply the "risk/utility test" to *any* product (whether or not it has a defect).**

By this reasoning, the plaintiff's attorneys contend—in this and other cases—

are not in their intended condition because of an error in the manufacturing process. Although the condition of a product complies with the manufacturer's intention, it can still be 'defective' if the design is not sufficiently safe or if the product does not have adequate instructions or warnings."

9. In a law review article written by one of the plaintiff's attorneys, it is estimated that the "fifty suits that have already been filed against handgun manufacturers and suppliers premised on theories of strict liability as described above, will grow to 200" during 1983. Turley, *"Manufacturers' and Suppliers' Liability to Handgun Victims,"* 10 N.Ky.L.Rev. 41 (1982).

that a nondefective handgun will be "defective and unreasonably dangerous" if the jury determines that the risks of injury and death outweigh any utility a handgun may have. (Transcript, pp. 11, 15, 30.) Specifically, they argue that:

"... Handgun use results in 22,000 deaths every year in the United States and that medical care for gunshot victims costs approximately $500 million each year. Although handguns constitute only thirty percent of all firearms sold in the United States, ninety percent of all cases of firearm misuse involve handguns. Most murders are sudden crimes of passion; without the ready availability of handguns, such crimes would be less likely. Proponents of manufacturers' liability further argue that handguns are almost useless for self-protection: a handgun is six times more likely to be used to kill a friend or relative than to repel a burglar, and a person who uses a handgun in self-defense is eight times more likely to be killed than one who quitely acquiesces. Thus, handguns, at least as distributed to the general public, are said to be defective." (Note, *supra* footnote 1, at 1914.)[10]

These arguments, of course, apply to *all* handguns, not just the "Saturday Night Special" involved in this case. See *Mavilia v. Stoeger Industries*, 574 F.Supp. at 110, footnote 2.

█ Aside from the fact that contrary evidence can obviously be advanced to argue the "social utility" of handguns[11]—and despite this Court's admi-

10. See Turley, *supra* footnote 9.

11. In this case, the defendants were directed that it was not necessary to include any such evidence in the summary judgment record. Transcript, pp. 31, 35. However, some arguments are obvious:

"... statistics on deaths involving handguns cannot capture all the possible uses and benefits of handguns. Handguns are collected as a hobby and are used for target shooting and hunting, as well as for self-defense. Despite the great movement in this country to ban or restrict handgun ownership, the failure of any state legislature to do so strongly suggests a general legislative agreement that handguns

ration for such a delightfully nonsensical claim: **that a product which does not have a defect can nevertheless, under the law, be defective** [12]—the plaintiff's attorneys are simply wrong. Under Texas law, there can be no products liability recovery unless the product does have a defect. Without this essential predicate, that something is wrong with the product, the risk/utility balancing test does not even apply.

**c. The Product Must Be Defective**

■ There can be no valid products liability claim without a product which has a defect. This is demonstrated by any of the Fifth Circuit cases which state the principles of Texas products liability law. For example, in *Syrie v. Knoll International*, 748 F.2d at 306, the court listed the four essential elements of a "strict liability cause of action"—and the very first one was **"a product [that] is defective."** Similarly, in *Davidson v. Stanadyne*, 718 F.2d 1334, the Fifth Circuit stated:

> "The principles governing recovery in a products liability case alleging defective design under Texas law have been recently summarized in *Kindred v. Con/Chem, Inc.*, 644 S.W.2d 828 (Tex. App.—Corpus Christi 1982), *rev'd on other grounds*, 650 S.W.2d 61 (Tex.1983):
>
> 'As established in [*Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex. 1979)], **the predicate for recovery in a defective design case is a showing**

**that the product was defective,** that the defect made the product unreasonably dangerous and that the defect was a producing cause of injuries....'" (718 F.2d at 1338) (emphasis added).[13]

See also *Scronce v. Howard Bros. Discount Stores, Inc.*, 679 F.2d 1204 (5th Cir. 1982) (sustaining directed verdict in favor of the gun manufacturer because the plaintiff failed to prove that there was a defect in the rifle); *Hulsebosch v. Ramsey*, 435 S.W.2d 161, 164 (Tex.Civ.App.—Houston 1968) (it is undisputed "that there was no malfunction of the weapon at the time it was fired by Taylor. The used military rifle did precisely what it was designed to when aimed at someone and its trigger pulled.... It is doubtful in a situation of this kind whether the doctrine of implied warranty or strict liability would apply in any event. Cf. Sec. 402A, Restatement of the Law of Torts, Second, Comment 'O,' p. 356.)"

**d. "Defective" vs. "Unreasonably Dangerous"**

This established principle—that a manufacturer is liable only if there is a defect in its product—is not changed by the fact that there are, as the plaintiff's attorneys argue, Fifth Circuit opinions which state that the words "defective" and "unreasonably dangerous" are *essentially* synonymous.[14]

---

do have social utility. Furthermore, handguns provide their owners with a psychic security that cannot be easily measured. And although the chances that an intruder will be shot by a homeowner or merchant are small, the consequences of a gunshot wound are so serious that the possibility may deter many people from attempting crimes." Note, *supra* footnote 1, at 1915.

Indeed, in the Texas state case mentioned above (footnote 5), the jury heard conflicting evidence like this—and then rendered verdict in favor of the manufacturer, refusing to find that the handgun was unreasonably dangerous or that "its risk outweighed its utility." Note, *supra* footnote 1, at 1925.

**12.** Lewis Carroll would have certainly approved. In *"Through the Looking Glass,"* he was very candid in Humpty Dumpty's statement: "When

I use a word, it means just what I choose it to mean—neither more or less."

**13.** See Note, *supra* footnote 1, at 1915–16 (particularly footnotes 19 and 20).

**14.** See *Hagans v. Oliver Machinery Co.*, 576 F.2d 97, 99 footnote 4 (5th Cir.1978) (verdict for plaintiff reversed because there was no design defect in an industrial table saw); *Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 142 footnote 1 (5th Cir.1978) (manufacturer of refrigerated meat trailer liable because of its design defect: instability caused by hanging quarters of beef unrestrained by partitions or tying to floor); *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1087 footnote 20 (5th Cir.1973) (insulation material containing asbestos defective because manufacturer failed to warn of dangers involved in inhaling asbestos dust).

**This is, in fact, true in most design defect cases.**

However, even a cursory review of these cases demonstrates that, in each instance, the Fifth Circuit required the existence of a defect—either one arising in a product's design, or in its manufacture, or in its marketing—before there could be recovery under Texas products liability law. (See footnote 14.) Moreover, the operative phrase used in § 402A of the *Restatement (Second) of Torts* —a product "in a defective condition unreasonably dangerous"— was deliberately chosen to make it clear that the product must be defective, and that the manufacturer of a product that may involve some danger, but that is not defective, will not be held liable.[15]

**e. The "Risk/Utility Test"**

In addition, the theory advanced by the plaintiff's attorneys perverts the very purpose of the "risk/utility balancing test" used in Texas products liability cases.

That test, itself, incorporates the idea that a defect is something that can be remedied or changed. Thus, in considering a design defect claim, the "very factors a jury is supposed to consider when weighing risk and utility includes the feasibility and cost of an improved design." Note, *supra* footnote 1, at 1916; *Davidson v. Stanadyne*, 718 F.2d at 1340; *Hagan v. EZ Mfg. Co.*, 674 F.2d at 1051–52.

But here, the plaintiff's attorneys offer no alternatives and no safer designs for a handgun. Nor can they do so—because a gun, by its very nature, must be dangerous and must have the capacity to discharge a bullet with deadly force. See Note, *supra* footnote 1, at 1916. Accordingly, by their unconventional application of the risk/utility test to a nondefective product, **the plaintiff's attorneys simply want to eliminate handguns.**[16]

Moreover, if this unconventional theory were correct, then it should apply equally to other products besides handguns—to rifles, to shotguns, to switchblade and kitchen and Swiss Army knives, to axes, to whiskey,[17] to automobiles, etc.—even though these products are not defective. The possible consequences of expanding products liability in this manner have been described:

"... a plaintiff would need only to prove that the product was a factual cause in producing his injury. Thus, the manufacturer of a match would be liable for anything burned by a fire started by a match produced by him, an automobile manufacturer would be liable for all damages produced by the car, a gun maker would be liable to anyone shot by the gun, anyone cut by a knife could sue the maker, and a purchaser of food with high calories would have an action for his overweight condition and for an ensuing heart attack. The liability would be like that created by a particularly stringent dramshop law." [18]

The plaintiff's attorneys argue that this drastic expansion need not occur—that a

---

**15.** When § 402A was originally drafted, it provided for liability if the product was "in a condition dangerous to the consumer." However, this language was amended to prevent products (e.g., whiskey) from being found "unreasonably dangerous" in their normal, nondefective condition. **The word "defective" was added "to ensure that it was understood that there must be something wrong with the product."** 38 ALI Proceedings 87–88 (1961), quoted in Wade, *"Design Defect"*, 43 Ohio State Law Journal 61, 73 (1982). See also *Restatement (Second) of Torts* § 402A (comment i).

**16.** See Turley, *supra* footnote 9; Note, *supra* footnote 1, at 1924–26.

**17.** "... the *Restatement (Second) of Torts* states that '[g]ood whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics.' Yet thousands of people in America are alcoholics, and alcoholism inflicts great costs on society. Alcohol contributes to diseases such as cirrhosis of the liver, and drunk drivers cause thousands of injuries and deaths in automobile accidents each year. It is by no means clear that the pleasure people derive from alcohol outweighs the cost in human lives imposed by alcohol abuse." (Note, *supra* footnote 1, at 1918–19.)

**18.** Wade, *"On the Nature of Strict Tort Liability for Products,"* 44 Miss.L.J. 825, 828 (1973).

handgun is not serving its function when it is used for unlawful purposes, so at least the illegal use of handguns should be subject to the risk/utility balancing test.[19] Obviously, this is wrong:

"... Virtually any product can be put to an illegal use: an automobile can be used in order to make a getaway from a bank robbery, or a ship in order to smuggle drugs, yet no one would suggest that those products were not performing their intended function of transportation. The argument that a jury should be permitted to subject a product to risk/utility scrutiny merely because it is often used illegally has no logical limit: the manufacturer of any product that is frequently put to illegal use could be called into court to defend his product." Note, *supra* footnote 1, at 1917.[20]

**f. Other Flaws**

The plaintiff's attorneys make four other erroneous arguments in support of their unconventional theory:

(i) They assert that in several cases the product was not defective, and performed exactly as it was intended—like the handgun in this case—but the manufacturer was nevertheless held liable because the product was found to be "unreasonably dangerous." This is not correct. The products in these cases were, in fact, defective because they were sold without sufficient warning of health risks or flammability.[21]

(ii) They assert that imposing this absolute liability upon handgun manufacturers simply furthers the products liability goal of placing the financial burden upon those who are best able to spread the loss. This is not correct. Our tort law is premised upon fairness, making individuals responsible for their own acts. Note, *supra* footnote 1, at 1919. The ability of a gun manufacturer to "spread the loss" is not a sufficient basis for requiring guiltless purchasers of guns to subsidize the actions of those who use firearms wrongfully. If it were, then we should simply hold—contrary to established principles—that all manufacturers who cannot produce a "fail-safe product" are insurers because of their ability to spread loss. *Id.*, at 1920, footnote 41.

(iii) They argue that, if their theory is not accepted, handgun manufacturers will be given a "special immunity" from responsibility for physical harm caused by their products. (Transcript, p. 9; Turley, *supra* footnote 9.) This is not correct. If this unconventional and unfounded theory is accepted, then—contrary to one of the basic principles of products liability [22]—**handgun manufacturers would become insurers** for all injuries resulting from their products. *Syrie v. Knoll International*, 748 F.2d at 307. However, by its rejection, manufacturers of handguns, like the producers of any other product, will be responsible for injuries caused by defects in designing their products, in manufacturing them, and in distributing them. *Carter v. Massey-Ferguson*, 716 F.2d at 346, footnote 1.

(iv) They claim that the fact that not a single legislature has banned handguns—and that most have rejected efforts for any meaningful gun control—"weighs very heavily in the plaintiff's favor." (Tran-

---

19. Turley, *supra* footnote 9, at 60–61.

20. Turley, *supra* footnote 9, at 60–61.

21. See *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973) (asbestos insulation performed as intended, but manufacturer failed to warn of the risks of cancer); *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652 (1st Cir. 1981) (birth control pills worked, but manufacturer failed to warn of dangers of stroke); *D'Hedouville v. Pioneer Hotel Co.*, 552 F.2d 886 (9th Cir.1977) (acrylic fiber carpet manufacturer failed to warn of risks of fire); *LaGorga v.*

*Kroger Co.*, 275 F.Supp. 373 (W.D.Pa.1967) (jacket performed as intended, but manufacturer failed to warn of flammable nature).

22. Throughout this circuit, juries in products liability cases are routinely instructed that the manufacturer is not an insurer and "is not required to make certain that no one will be hurt in using its product or to market a product that is accident proof." See *"Pattern Jury Instructions—Civil Cases,"* U.S. Fifth Circuit District Judges Association, pp. 115–16 (West 1980). See also the cases cited in footnote 6.

script, p. 26; see Turley, *supra* footnote 9.) This is not correct. It would be improper for courts to ignore the fact that legislatures have repeatedly rejected arguments like those made by the plaintiff's attorneys in this case. Indeed, as other courts have held,[23] the clear inference is that the majority of legislators—**certainly those in Texas** [24]—do not consider that the manufacture and sale of handguns to the public is unreasonably dangerous or is socially unacceptable.

### 3. THE ALLEGED DEFECT IN DISTRIBUTION

■ The plaintiff's attorneys also claim that the manner in which handguns are distributed is "defective and unreasonably dangerous" because it is too easy for handguns to be obtained by persons who misuse them (including criminals, such as Berlin Ransom in this case).[25] Here, they rely upon *Richman v. Charter Arms Corp.*, 571 F.Supp. 192 (E.D.La.1983), in which the district court did hold that the sale of handguns indiscriminately to the public could constitute an "ultrahazardous activity under Louisiana law." [26]

■ However, *Richman*—which is pending on the Fifth Circuit's certification of the controlling issues to the Louisiana Supreme Court (see footnote 5)—is contrary to Texas law. There is simply no such products liability principle as "defect in distribution." Under Texas law, the plaintiff in a products liability case must establish that the product was defective because of its unsafe design, or an error in manufacturing, or the failure to give adequate warnings or instructions. See *Davidson*, 718 F.2d at 1338; *Carter v. Massey-Ferguson*, 716 F.2d at 346, footnote 1. This is also true in Illinois, so *Richman* was specifically rejected by the Seventh Circuit in *Martin v. Harrington and Richardson*, 743 F.2d 1200:

> "Our primary misgiving with *Richman* is that it blurs the distinction between strict liability for selling unreasonably dangerous *products* and strict liability for engaging in ultrahazardous *activities* by making the sale of a product an activity. Accepting plaintiffs' argument would run counter to Illinois' long-standing requirement that strict liability for the sale of a product be limited to unreasonably dangerous products. Illinois has never imposed liability upon a non-negligent manufacturer of a product that is not defective.

> "A change in this policy, as observed in *Riordan*, would require that manufacturers of guns, knives, drugs, alcohol, tobacco and other dangerous products act as insurers against all damages produced by their products. Whatever the economic wisdom of such a policy might be, there is no basis for assuming that

---

**23.** See *Martin v. Harrington and Richardson*, 743 F.2d at 1204; *Mavilia v. Stoeger Industries*, 574 F.Supp. at 111; *Riordan*, quoted in *Martin*, 743 F.2d at 1204.

**24.** During the 1981 session of the Texas legislature, at least 18 gun-control bills were introduced. **None passed.** Note, *"A Farewell to Arms?—An Analysis of Texas Handgun Control Law,* 13 St. Mary's L.J. 601, 604–09, 620 (1982). The Texas Constitution guarantees that "every citizen shall have the right to bear arms in defense of himself and the republic" (Tex. Const. art. I, § 23), and chapter 46 of the Texas Penal Code imposes only moderate restrictions on handgun ownership and possession.

**25.** This theory is not as well-articulated in the present case as in others. However, the plaintiff's attorneys here also represented the plaintiff in *Richman*. See Turley, *supra* footnote 9. See also Note, *supra* footnote 9, at 1912, 1930.

**26.** This argument does find some support in *Moning v. Alfono*, 254 N.W.2d 759 (Mich.1979). There, the Michigan Supreme Court held that "if a jury finds that the risks of selling slingshots to young children outweigh the utility of permitting the children to have slingshots, the manufacturer can be held liable for the injury that results when one child shoots another with a slingshot." Note, *supra* footnote 1, at 1920. However, the *Moning* opinion points out that "special rules for children are not unusual." 254 N.W.2d at 768. And, in any event, there are contrary decisions—see *Bojorquez v. House of Toys, Inc.*, 62 Cal.App.3d 930, 133 Cal.Rptr. 483, 484 (1976)—so it has been noted that "the view expressed in *Moning* is not universally accepted, however, and will not easily be extended." Note, *supra* footnote 1, at 1920–21.

Illinois wishes to adopt it." (743 F.2d at 1204.)[27]

Moreover, as discussed above, the risk/utility balancing test is founded upon the premise that the alleged defect can be repaired or remedied. Yet, there is simply no way that a manufacturer could devise a safe and effective system of distributing handguns—without ceasing distribution entirely, even to persons who want them for legitimate reasons. See *Martin*, 743 F.2d at 1201, footnote 1; Note, *supra* footnote 1, at 1291.[28]

In addition, even if the alleged "defect in distribution" could be shown, there would be no liability unless the defect actually caused the injury. Yet:

> "... In order to prove actual causation (cause in fact), the plaintiff would have to show that his assailant would not have acquired a handgun had the manufacturer used a 'nondefective' system of distribution. If the assailant would have been able to purchase a handgun despite a 'better' system of distribution, the plaintiff could not recover. Because many of the people who misuse handguns have no criminal record or established history of violence, a distributional system that attempted to weed out people who were likely to misuse handguns could not prevent distribution to most of those who actually did misuse them; hence the cause-in-fact requirement would be difficult to fulfill." (Note, *supra* footnote 1, at 1922–23.)

Accordingly, the Third Circuit, also rejected the *Richman* decision in *Martin v. Harrington and Richardson*, 743 F.2d at 1205, by specifically holding that the criminal misuse of a handgun breaks the causal connection between the manufacturer's actions and the injury "because such criminal activity is not reasonably foreseeable."

This is also the law in Texas. In *Hulsebosch v. Ramsey*, 435 S.W.2d at 163, the court held that the seller of a rifle was not liable to someone shot by it because the seller could not have foreseen "the clearly negligent act of young Taylor in aiming the rifle at plaintiff and pulling the trigger."[29] Accordingly, the supposed product liability claim of a "defect in distribution" is also baseless, and is rejected.

## 4. CONCLUSIONS

Despite the well-documented dangers of **"Saturday Night Specials"** and other handguns, not a single state has seen fit to prohibit the manufacture and sale of handguns. Nor has Congress passed any meaningful gun-control measures.

The increasing number of cases like this one (footnote 9) are intended to change this (see footnote 9), and to accomplish gun control under the guise of products liability law—by trying to subject handgun manufacturers to liability for all injuries caused by their products. Presumably, the proponents of these suits feel that "judges and juries enjoy immunity from the political pressures of the gun control lobby," and that handgun control "is not going to come

**27.** For example, if the "defect in distribution" theory were adopted, "a jury could conceivably find that indiscriminately selling an automobile to any nonminor with enough money to buy one is a 'defective' method of distribution and that manufacturers should therefore compensate all victims of automobile accidents." Note, *supra* footnote 1, at 1923–24.

**28.** Here, the plaintiff's attorneys concede that even a "proper" distribution system for handguns would not answer their complaints. For example, if Rohm .38 caliber revolvers were distributed only to law enforcement officers— and if Berlin Ransom had killed Patterson with a Rohm .38 taken from a policeman who was trying to stop the robbery—the plaintiff's attor-

neys still maintain that the case should "go to the jury" for a determination of whether the handgun was "unreasonably dangerous" because its risks outweighed its utility. Transcript, pp. 17–20.

**29.** *See* Holmes, *Privilege, Malice, and Intent*, 8 HARV.L.REV. 1, 10 (1894) (arguing that a seller of firearms should not be held liable for crimes committed with those firearms, because "every one has a right to rely upon his fellow-men acting lawfully"), *quoted in Mavilia v. Stoeger Indus.*, 574 F.Supp. 107, 100 (D.Mass.1983). *See also* Note, *supra* footnote 1, at 1919 (particularly footnote 39); *Bennet v. Cincinnati Checker Cab*, 353 F.Supp. at 1210.

**1216**

legislatively any time soon, if ever." Note, *supra* footnote 1, at 1925.

But the unconventional theories advanced in this case (and others) are totally without merit, a misuse of products liability laws. It makes no sense to characterize any product as "defective"—even a handgun—if it performs as intended and causes injury only because it is intentionally misused. Similarly, the claim that handgun manufacturers should be held responsible for keeping their products out of the hands of criminals—an admittedly impossible task—is an unsupported, tortured extension of products liability principles. *Id.*, at 1912. Both theories are contrary to the established law that a manufacturer is not an insurer of its products; and both theories would, unless logic is abandoned, be applicable to other products besides handguns.

Moreover, **the judicial system is, at best, ill-equipped to deal with the emotional issues of handgun control.** Certainly, there can be no effective handgun control imposed on an ad hoc basis by six or twelve jurors sitting in judgment on a single case. Decisions in these suits—made on the basis of a particular record developing a unique set of facts—will necessarily be inconsistent, and there can only be varying and uneven results in different jurisdictions. *Id.*, at 1925–27; *supra*, footnote 5. Thus, an overwhelming number of cases—and tremendous expenditure of judicial resources—would be required before the proponents of these unconventional theories could even begin to accomplish their ultimate goal: driving all handgun manufacturers out of business. (See Turley, *supra* footnote 9.)

**As an individual, I believe, very strongly, that handguns should be banned** and that there should be stringent, effective control of other firearms. **However, as a judge, I know full well that the question of whether handguns can be sold is a political one,** not an issue of products liability law—**and that this is a matter for the legislatures, not the courts.**

Accordingly, this case is DISMISSED.